FILED

2014 Sep-30  PM 05:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **ANDREW BENNETT; RODERICK V. ROYAL; MARY MOORE; JOHN W. ROGERS; WILLIAM R. MUHAMMAD; CARLYN R. CULPEPPER; FREDDIE H. JONES, II; SHARON OWENS; REGINALD THREADGILL; RICKEY DAVIS, JR.; ANGELINA BLACKMON; SHARON RICE; DAVID RUSSELL,** ) ) ) ) ) ) ) ) ) ) ) | |
| **Appellants,** ) | **CASE NO. 2:14-CV-0213-SLB** <br> **Bankruptcy Case No. 11-05736-TBB9** |
| ) | |
| **vs.** ) | |
| ) | |
| **JEFFERSON COUNTY, ALABAMA,** ) | |
| ) | |
| **Appellee.** ) | |

## MEMORANDUM OPINION

This case is before the court on the Motion for Partial Dismissal filed by appellee Jefferson County, Alabama, (doc. 4),[1] and Motion to Consolidate, (doc. 14), and Motion to Strike, (doc. 15), filed by appellants – Andrew Bennett; Roderick V. Royal; Mary Moore; John W. Rogers; William R. Muhammad; Carlyn R. Culpepper; Freddie H. Jones, II; Sharon

---

[1]Reference to a document number, ("Doc. ___"), refers to the number assigned to each document as it is filed in the court's record of this case. Reference to a document filed in the bankruptcy record, ("B. doc. _____"), refers to the number assigned to a document as it was filed in the bankruptcy court's record in Case No. 11-05736-TBB9. Page numbers to record citations refer to the page numbers assigned to the documents by the CM/ECF electronic filing system.

Owens; Reginald Threadgill; Rickey Davis, Jr.; Angelina Blackmon; Sharon Rice; and David Russell (hereinafter "the Ratepayers"). The Ratepayers have appealed the bankruptcy court's confirmation of the County's Chapter 9 Plan, as well as certain other orders in related adversary proceedings. For the reasons below, the court finds that the County's Motion for Partial Dismissal, (doc. 4), is due to be granted in part and denied in part, and the Ratepayers' Motion to Strike, (doc. 15), and their Motion to Consolidate, (doc. 14), are due to be denied.

## I. <u>MOTION TO STRIKE</u>

The Ratepayers, pursuant to Rule 12(f) of the Federal Rules of Civil Procedure and Rule 7012 of the Federal Rules of Bankruptcy Procedure, ask the court to strike the County's Motion for Partial Dismissal. (Doc. 15 at 2.) Rule 12(f) allows a court to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Rule 7012 is inapplicable because the Rules of Part VII of the Federal Rules of Bankruptcy Procedure govern only adversary proceedings, and an appeal from the bankruptcy court is not an adversary proceeding. *See* Fed. R. Bankr. P. 7001. The Ratepayers do not contend that the County's Motion for Partial Dismissal is "a pleading," or that it is "redundant, immaterial, impertinent, or scandalous." Rather, they assert that the Motion is premature and "legally unsupportable," and that the "Bankruptcy Rules do not allow a preemptive strike on appellants' opening brief." (Doc. 15 at 3-4.)

The court disagrees. Indeed, the Eleventh Circuit has affirmed the practice of deciding a motion to dismiss an appeal on mootness grounds before addressing the merits.

2

*See*, *e.g.*, *In re Seidler*, 44 F.3d 945, 947 (11th Cir. 1995).  Therefore, the Ratepayers' Motion to Strike, (doc. 15), will be denied.

## II.  MOTION FOR PARTIAL DISMISSAL

### A.  FACTS AND CLAIMS OF THE RATEPAYERS[2]

In a Memorandum Opinion entered in 2012, the bankruptcy court set forth the following facts:

> The origins of Jefferson County, Alabama's bankruptcy case are both recent in vintage and far removed from the filing date of its chapter 9 case on November 9, 2011.  Two major factors precipitating its bankruptcy are crushing debt and the loss of a large part of its tax revenues that were not earmarked for specific purposes.
>
> . . .
>
> The far removed precipitating factor is also partly one of recent vintage. It is a debt load well in excess of $4,000,000,000.00.  The majority of this debt is directly attributable to massive borrowing in the form of warrants issued from 1997 to 2003 to finance the construction and repair of a sewer system owned by the County . . . .  The aggregate of the warrants issued between 1997 and 2003 is $3,685,150,000.00 and the unpaid principal balance is around $3,200,000,000.00.
>
> Part of the sewer related debt involves a complex and failed combination of swap and interest rate stabilization agreements.  Simplistically and at the behest of former county commissioners, the County believed it could lower the interest on warrants by shifting from fixed rates to adjusting ones.
>
> . . .

---

[2]The sole function of this fact section is to frame the issue of mootness, not to fact-find.  The court has interspersed the claims of the Ratepayers throughout this section in footnotes because they are easier to understand in this context than by summarizing their brief, (doc. 23), and their Statement of the Issues on Appeal, (doc. 1-7).

Superficially, the indebtedness caused by the sewer system construction and repair might appear to be only a relatively recent set of events. It is not. Why it is not is that sewer systems in the state of disrepair of those the County had and added to did not get to their level of disrepair over just the course of a few years or a few decades. Absent some catastrophic event, it took upwards of a century of neglect by the County and the other municipal governments from which the County acquired twenty some sewer systems. The many decades of failing to properly maintain these sewer systems is the farther in time factor.

. . .

Ironically, it is the structure of the debt incurred to finance the sewer system upgrades and repairs that has prevented its costs from being spread onto all of the individuals and businesses located in the County. It is also this structure that makes it highly unlikely that the value — not the gross amount — of what was loaned can ever be fully repaid.

The structure is warrants. Not warrants that are general obligations, repayment of which could come from general revenues of the County. Rather, the County utilized special revenue warrants making the revenues of the sewer system the sole source of repayment of the warrant debt. Conceptually, it is this limited source of repayment that keeps the inhabitants of the local governments paying for the failures of their localities to maintain their sewer systems. . . . Why these costs cannot be directly imposed on all of the inhabitants of the County is the limited source of repayment of the sewer system debt.

. . .

Under the security documents, the warrant holders possess a lien that is first in priority and the ability of the County to borrow more monies is subject to rights accorded the warrant holders under the lending documents.

Over time, special revenue warrants have been utilized for project financing on a greater and greater scale and have become for some municipalities the exclusive means of borrowing for projects such as water systems, sewer systems and other wants and needs. Why this has occurred will vary from location and time of projects. However, all have certain characteristics that make them attractive to municipalities. In many states,

special revenue warrants do not require a vote by the citizens of the municipality, while bonds frequently do. This is the case for Jefferson County.[3] Another commonality is that special revenue warrants are not counted as debt for indebtedness limits imposed by states on its municipalities.[4] This, too, is the case in Alabama. A third is that many states do not allow municipalities to encumber their properties with liens that could be enforced by foreclosure or repossession of the properties. Yet again, this is a feature Alabama shares with other states.

Notwithstanding lawyers, judges, politicians and those in the business of selling the means of financing for municipalities — who see these three common characteristics through a lens clouded by legal niceties, private preferences, and money making — the reality is that two are not true from an economic perspective. When one understands that for any capital project its value over a useful life span equates to the revenues it generates, the granting of a lien on the revenue stream for decades is not from an economist's view much different than having a lien on the capital good. Accentuating this economic viewpoint is the appointment of the Receiver for the County's sewer system with the sole authority to operate and control it for potentially decades, if not its useful life.[5] This is not much different than a foreclosure or

_____

[3]One of the Ratepayers' claims is that, in fact, this is ***not*** the case for Jefferson County. (*See* doc. 1-7 at 6 ¶ 2; doc. 23 at 9, 19, 22.) However, in the Confirmation Order, the bankruptcy court found that "ratepayer approval was not required for the issuance of the Sewer Warrants." (Doc. 1-2 [B. Doc. 2248] at 23.)

[4]One of the Ratepayers' issues is, if the warrants are not debt, the County was not "insolvent" at the time it filed bankruptcy. (See doc. 1-7 at 14; doc. 23 at 23-24); *see also Bank of N.Y. Mellon v. Jefferson County*, No. 2:08-cv-01703-RDP, 2009 U.S. Dist. LEXIS 122093, *38 (N.D. Ala. June 12, 2009)("The Warrants at issue are non-recourse debt. Thus, any judgment in this action must be paid from the sewer revenues which are undisputedly inadequate."); *In re Jefferson County*, 469 B.R. 92, 98 n.2 (Bankr. N.D. Ala. 2012) (explaining differences between bonds and warrants, and noting that the County has a "vested interest in maintaining that its warrants are warrants and not some other sort of indebtedness"). Related to this is the Ratepayers' claim that the County presented the Plan in bad faith in violation of 11 U.S.C. § 1129(a)(3). (Doc. 1-7 at 14 ¶ 11, 18-19 ¶¶ 37, 42, 43.)

[5]One of the Ratepayers' claims is that the bankruptcy court improperly assumed the duties and authority of the receiver. (Doc. 1-7 at 16 ¶¶ 24-26; doc. 23 at 20 ¶ 4; Transcript

repossession.  It effectively strips the County from control of its property and, if it lasts long enough, from the aggregate value of what is the sewer system.

In a similar vein, the concept that special revenue warrant financing is not a debt of the County may be accurate from a certain legal perspective.[6]  It is misguided and wrong in the realm of financial matters.  This case is an example of why.  When sewer usage charges increase beyond a point, the ability of the County to obtain revenue from other sources for other purposes is constrained.  Despite the fact that the County has not pledged its full faith and credit for the payment of these warrants, this form of debt still indirectly impairs its ability to borrow and tax.  At the point now reached by the County, the payment of increasing sewer charges takes monies from its residents that might otherwise have been available via taxes, assessments, fees, or other means.  It also has caused the County to use non-sewer revenues and County properties to subsidize some costs and expenses attributable to the sewer system which have not been fully reimbursed from sewer system revenues.[7]  These indirect effects are some of what states wanted their municipalities to avoid when they imposed debt limits on them:  excessive borrowing that impairs municipal governments from getting monies via taxes, fees, or otherwise for other purposes and dedicating properties and monies to debt service that might be better used elsewhere.

The one correct common factor is that the special revenue warrant financing has reduced, if not avoided, input from all of the inhabitants of the County.  No vote by the inhabitants of the County was required for the special revenue warrant financing.  For those in the business of selling such financing and those desirous of building projects, this may be good, but for those who have to pay, it is not such a good thing when done in excess.

---

of Nov. 21, 2013 hearing at 982.)

[6]The Ratepayers contest this, insofar as it would allow the County to issue warrants without voter approval or consideration of debt ceilings, or, in the alternative, they claim that this means that the County was not insolvent at the time it filed bankruptcy.

[7]In arguing that the County was not insolvent when it petitioned for bankruptcy, the Ratepayers quoted *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1387 (10th Cir. 1998): "Chapter 9 does not offer relief to a municipality simply because it is economically distressed. Relief is only available if the debtor was 'insolvent' . . . ." (Doc. 23 at 22-23) (internal citations omitted).

Excess is clearly what occurred with the County's special revenue warrant financing for the sewer system. Many causes for this excess have been presented to the Court. They include graft and fraud by former county commissioners and county employees; in particular, former county commissioners who headed the department overseeing the sewer system and certain of the department's top personnel.[8] All of them have been found or plead guilty on federal bribery and related charges for obtaining monies and other benefits from contractors hired to build parts of the sewer system.

Not to be outdone by the public sector is the business sector. Here, numerous businesses and individuals who were officers, owners, or employees of businesses doing the construction work for the sewer system were charged with crimes including fraud and bribery associated with their work for the County. Just as with the former county commissioners and county employees, some plead guilty and others were convicted. So far, the total of public and private persons and entities determined to have committed crimes related to the County's sewer system is somewhere in the low twenties.[9]

Those involved in investment banking and municipal finance were not out of the loop when it came to dishonest or inappropriate conduct. Some of those involved in the development and sales of the types of financial instruments used in part by the County for its sewer system's needs have committed crimes related to what was sold to the County. Others have not been charged with crimes, but have entered settlements with the United States Securities and Exchange Commission where there is no admission of wrongdoing, but payments in the tens of millions of dollars have been made.

. . .

Starting with the first indenture (the Indenture) dated as of February 1, 1997, by and between the County and the Indenture Trustee, and through the

---

[8]The Ratepayers allege that the bankruptcy court erred in failing to distinguish warrants tainted by bribes, which the Ratepayers claim total $1.63 billion and are void *ab initio*, from legitimate warrants. (Doc. 1-7 at 12-13 ¶¶ 1, 5; doc. 23 at 7.)

[9]The Ratepayers allege that the bankruptcy court "did not inquire into the legality of the County's issuance and execution of Swap/Warrants where an allegation of fraud, corruption, or undue influence, effecting a fraudulent transfer of the county's credit for private benefit was made." (Doc. 1-7 at 12 ¶ 2.)

course of eleven supplemental indentures, the County agreed to payment terms and secured payment of the warrants issued by it.  Initially, the warrants bore fixed rates.  By 2001, though, and continuing into 2003, the County issued variable rate and auction rate warrants.  Both put the County at risk of interest rate fluctuations.  [Footnote omitted.]

. . .

By February 2008, various defaults under the Indenture and the warrants had occurred and continued.  In April 2008, the County was unable to make principal payments due on certain of the warrants.  Between April of 2008 and August of that year, forbearance agreements were entered involving the County and representatives of warrant holders, among others.  Unable to resolve matters with the County, the Indenture Trustee and others filed suit in September 2008, in the United States District Court for the Northern District of Alabama against the County and its then commissioners.  The case is styled *The Bank of New York Mellon, et al. v. Jefferson County, Alabama, et al.*, Case No. 2:08-CV-01703-RDP.  Since the remedies sought in this federal case are substantially the same as those of a subsequent Alabama state court case, a detailed rendition of them is not given.  It is sufficient to point out that one was the appointment of a receiver for the County's sewer system which was opposed by the County.

. . .

Although the District Court Judge determined in June 2009, that there was justification for appointment of a receiver, he abstained from this request based on the Johnson Act, 28 U.S.C. § 1342,[10] not allowing federal

---

[10]Section 1342 states:

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

appointment of a receiver with rate setting authority. [*See Bank of N.Y. Mellon v. Jefferson County*, 2009 U.S. Dist. LEXIS 122093 (N.D. Ala. June 12, 2009).] This was one of the Indenture Trustee's most desired functions for the sought after receiver. The abstention order was entered on June 12, 2009, for the receivership portion of the complaint and the residual portions of the requested relief were not decided.

> . . .

In order to obtain a receiver with rate setting power for the sewer system, the Indenture Trustee initiated suit in the Circuit Court of Jefferson County, Alabama on August 3, 2009, in the case captioned *The Bank of New York Mellon, as Indenture Trustee v. Jefferson County, Alabama, et al.*, case number CV 2009–02318. Also named defendants in this suit were the then Jefferson County Commissioners. In this state court proceeding, the Indenture Trustee again sought appointment of a receiver for the County's sewer system, an accounting for the sewer system's revenues, *mandamus* against the county commissioners and prohibition against the county commissioners and the County regarding certain aspects of the operations of the sewer system, and a judgment for unpaid monies owed warrant holders.

Partially due to the absence of any dispute that the County had breached the terms of the Indenture and the warrants by both non-monetary and monetary defaults, the Alabama court judge granted partial summary judgment in favor of the Indenture Trustee by an order entered on September 22, 2010 (hereinafter "the Receiver Order"). By this order, John S. Young, Jr., LLC, a Delaware limited liability company, was appointed receiver for the County's sewer system and the Indenture Trustee was awarded a judgment of $515,942,500.11 against the County. Collection of the judgment is expressly

---

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342.

limited to revenues available under the Indenture's terms to pay the sewer system indebtedness.

. . .

Specific findings by the Alabama receivership court regarding the County and its sewer system are that the warrant holders have been harmed by the loss of sewer system revenues that resulted in lowering the amount of monies available for payment of the warrants by (i) not increasing sewer system usage rates as required by the Indenture, and (ii) not operating the sewer system in an "economical, efficient and proper manner."  More pointedly, the County did not timely and sufficiently increase customer sewer rates and failed to collect monies from sewer customers some of whom/which the County did not even know were using the sewer system.  Other issues were excessive staffing and the County diverting sewer system monies for unauthorized purposes such as paying other, non-sewer related County expenses.  The repercussion of all of these and other failures by the County was to decrease monies available to pay the warrants.

. . .

Important for consideration now are those [portions of the Receiver Order] that demonstrate what was done by the Receiver Order and what was not done.  There is no doubt that the only purpose of the receivership is to force compliance with the terms of the Indenture as was requested by the Indenture Trustee. . . .  It is an order giving a private creditor a contracted for and statutory remedy to enforce portions of the indentures and warrants designed to protect interests of the warrant holders because the County had failed to do what was required of it under the terms of the loan documents.

Exclusive possession, custody and control of the sewer system along with certain non-sewer system properties and the exclusive authority to operate the sewer system was given to the Receiver.  The Receiver was also granted the authority to fix and charge sewer rates, collect the system's revenues, pay its bills, implement operational efficiencies and other revenue increasing measures, and a cadre of other rights and abilities designed to increase the revenues payable to the warrant holders be it from increased sewer rates, obtaining monies from other sources, or decreasing costs.

The Receiver was denied authority without some future "express order of [the Alabama receivership court] to sell or otherwise dispose" of the sewer system or any part of it.  Likewise, the Receiver Order does not alter the ownership and title to the sewer system properties.  All remain owned by and titled in the County.  . . .  [A]nother paragraph of the Receiver Order delineat[es] that the Receiver owes duties to the sewer system and the Court, not to the County, the Indenture Trustee, or others.

. . .

The evidence indicates that the Receiver has done a much better job during his tenure than was done by the County during the tenures of its former county commissioners.

. . .

The one thing the Receiver has not accomplished is one of the most important to the Indenture Trustee:  further increases in sewer usage rates.

. . .

During the receivership period of a little over a year before the chapter 9 [proceeding was filed], the Receiver acted as a go between in the efforts by the County, the Indenture Trustee, insurers of payments of certain of the warrants, banks providing liquidity to the parties, and others to resolve the sewer system related debts of the County.  To that end, it appeared in mid 2011 that a compromise had been reached that would have reduced the warrant indebtedness to somewhere around $2,200,000,000.00 and involved the refinancing of the remaining debt.

On September 16, 2011, the Jefferson County Commission approved a term sheet with the Receiver establishing the framework for a settlement with its sewer system related creditors.  The perceived settlement was never finalized.

. . .

There is evidence that the new commissioners are willing to take unpopular stances and undertake certain actions that might be contrary to their best political interests when it comes to re-election.  One is that as part of the

11

term sheet framework they agreed to rate increases of 8.2% per year for three years commencing on November 1, 2011, followed by up to 3.25% per year increases for what is an untold number of years. This is despite the fact that the average sewer rates increased over 300% since 1997 and would increase by a further 527% based on rates desired by the Indenture Trustee. These sorts of increases would take the average monthly residential sewer bill of $63.00 per month up to above $360.00 per month under the Indenture Trustee's wishes. Recognizing the economic and legal limits on what rate increases could be made, the Receiver studied both the structure of the rates and the ability of users to pay increased rates. Its conclusion was an immediate 25% rate increase was justifiable with another 25% in a year achievable along with other yearly increases for the future. As is evident, none of the scenarios regarding rate increases is pleasant for those who must pay them, or for those who must thereafter face the voters.[11]

. . .

Perhaps the most controversial action the new county commissioners have taken is to file the County's chapter 9 bankruptcy case — an action which has been resisted by large segments of the political and business leadership of Alabama.

. . .

The fights over the sewer system and its revenues have played out over the course of more than three years in two court systems, one federal and one state, without resolution of the sewer related obligations and, now more importantly, resolution of all of its various debts and obligations unrelated to its sewer system. If nothing more is known, it is that pre-bankruptcy the agreement of all creditors was necessary to restructure the County's financial affairs. Obviously, agreement by all was not obtained. If there is any bright side to the County's municipal bankruptcy, the consent of all creditors is not

---

[11]The Ratepayers claim that the rate increases mandated by the Plan are not fair and equitable, and that the bankruptcy court made no findings supported by "economic data showing [that] the rate increases are feasible . . . ." (Doc. 1-7 at ¶¶ 6, 27, 29, 39.) Essentially, they claim that, considering the median income of Jefferson County sewer ratepayers, the future rate increases are not merely unpleasant, but they are unsustainable.

a requirement for, nor necessarily an impediment to, the County's ability to adjust its debts.

*In re Jefferson Cnty., Alabama*, 474 B.R. 228, 236-245 (Bankr. N.D. Ala. 2012).

In its Memorandum of Law in Support of Motion for Partial Dismissal, (doc. 5), the

County adds the following facts:

> After multiple rounds of intense litigation and negotiations over the course of eighteen months, the County announced in June 2013 that it had reached agreements in principle with almost all of its major creditors and therefore would soon be ready to propose a plan of adjustment that would allow it to exit bankruptcy. . . . [T]he County and its creditors arrived at a final settlement and proposed plan in November 2013. [(B. Doc. 2182 [the Plan].)] Most significantly . . . the County's Plan proposed that the County would issue and sell in the public markets new sewer warrants ("New Sewer Warrants") in the amount of approximately $1.785 billion, the net proceeds of which would be used (along with other funds on hand) to redeem and retire the Retired Sewer Warrants and related obligations in a reduced, compromised amount of approximately $1.8 billion. [(B. Doc. 1977 at 153-55.)]

(Doc. 5 at 15-16.)

In arguing for the Plan's confirmation, the County had stated that the "Plan slashes

the outstanding sewer debt from approximately $3.2 billion to approximately $1.7 billion –

a consensual reduction of nearly **half** of the outstanding principal." (B. Doc. 2203 [Omnibus

Reply Brief in Support of Plan Confirmation] at 14 [emphasis in original].)  The County

argued that the Plan was "built on three basic principles":

1. Cost-Cutting by the County.  The County asserted that it –

has cut over $100 million in General Fund expenditures by, *inter alia*, closing satellite courthouses, cutting staff and expenses in essentially every department, and drastically reducing services . . . .  These measures fulfill a basic purpose of debt adjustment under chapter 9 – matching expenses to

revenue.  The County had to cut these costs because the County cannot generate additional revenue from new sources, given the lack of home rule and the State of Alabama's refusal to replace lost occupational tax revenue.

(*Id.*)

2.  Concessions from the Creditors.  The County asserted that its creditors –

have agreed to write off nearly $1.5 billion in outstanding debt, . . . [including] the largest sewer creditor (JPMorgan Chase Bank, N.A.) writing off a significant amount of its investment . . . .  In addition, the Plan restructures [the non-sewer debt from being risky to being less risky, and] provides for repayment in full of all non-sewer warrants on terms favorable to the County, which ultimately will help the County regain access to the capital markets.

(*Id.* at 15.)

3.  Sustainable Sewer Rates.  The County asserted that –

the Plan depends on a series of single-digit sewer rate increases that the County Commission – the only body constitutionally charged with the responsibility and obligation to fix sewer rates and charges – [which were determined to be determined were reasonable and feasible].

(*Id.*)

The "single-digit sewer rate increases" to which the County refers in its third basic principle manifest themselves in the Plan's Approved Rate Structure, and the Confirmation Order required the County Commission to "adopt and maintain the Approved Rate Structure in accordance with the Rate Resolution."  (Doc. 1-2 at 57.) The Approved Rate Structure is a schedule that, unless a specified alternative method is employed, requires the County

14

Commission to increase sewer rates by at least[12] 7.89% per year for the first four years (a total increase of at least 35.47%),[13] and at least 3.49% per year for "each remaining fiscal year that the New Sewer Warrants remain outstanding . . . ."  (B. Doc. 2182 at 109-110.) Assuming a forty-year implementation, as discussed below, the minimum total increase will be approximately 365%.[14]

If the County Commission does not make the required rate increases, the bankruptcy court can order compliance with the Approved Rate Structure, because the bankruptcy court "pursuant to Bankruptcy Code section 945(a) . . . retain[ed] jurisdiction over the Case and as provided in Section 6.4 of the Plan."  (Doc. 1-2 at 77.)  Section 945(a) allows the bankruptcy court to "retain jurisdiction over the case for such period of time as is necessary for the successful implementation of the plan."  11 U.S.C. § 945(e).  Section 6.4 of the Plan reserves "exclusive jurisdiction" to the bankruptcy court to adjudicate disputes over the "enforcement of the Approved Rate Structure."  (B. Doc. 2182 at 91-92 ¶ 4(l).)  The Plan contemplates that its implementation – that is, the retiring of the New Sewer Warrants – will take forty years.  (B. Doc. 2203 at 14.)

_____

[12]The Approved Rate Structure allows the County Commissioners to "increase User Charges at any time." (B. Doc. 2182 at 111.)

[13]To put this in perspective, according to a Consumer Price Index (CPI) inflation calculator provided on the website for the Bureau of Labor Statistics, the total inflation from 2010 to 2013 was approximately 7%.  *See* CPI Inflation Calculator, available at http://www.bls.gov/data/inflation_calculator.htm.

[14]Inflation in the national economy over the last forty years has totaled 379%.

15

The County Commission's alternative to making the "Required Percentage Increases" is to enact a specified "Adjusting Resolution." (B. Doc. 2182 at 109.) The Adjusting Resolution alternative does not give the County Commission discretion to decide for itself how it will handle sewer rates because any Adjusting Resolution must "fully comply with the New Sewer Warrant Indenture, including the rate and revenue covenants therein." (*Id*. at 111.) Those rate and revenue covenants require the County to take certain measures to remedy any failure to comply with the "Required Coverage Ratios," one of which requires that "Net Revenues [of the sewer system] for the Fiscal Year in question must be not less than 110% of Debt Service Requirements on all Secured Obligations payable during such Fiscal Year." (B. Doc. 2245-1 [Trust Indenture, or New Sewer Warrant Indenture dated Dec. 1, 2013] at 15, 63.) This provision precludes the County from enacting an Adjusting Resolution that decreases rates unless it can somehow offset the decrease in ***that fiscal year***, for instance by increasing its customer base.[15]

The County publicly offered New Sewer Warrants totaling $1,785,486,521.65. (Doc. 5 at 15; doc. 7-1 at 2.) One credit rating agency, Fitch, Inc., gave these warrants a "junk

---

[15]In arguing in favor of confirming the Plan, the County explained that "[t]he only limitation on the ability of future Commissions to set rates is that the Sewer System must be self-sustaining . . . ." (B. Doc. 2203 at 28.) To realize the power of this limitation, imagine if the "only" limitation on the power of future Congresses to levy taxes was to have a balanced budget at the end of the year. While that might represent a sensible policy, it would take a constitutional amendment, not a statute, to require it. *See Dorsey v. United States*, 132 S. Ct. 2321, 2331 (2012)("[S]tatutes enacted by one Congress cannot bind a later Congress . . . ."). For such an amendment attempt, see *Uhler v. Am. Fed'n of Labor-Cong. of Indus. Organizations*, 468 U.S. 1310, 1310 (1984) (Rehnquist, J., in chambers).

16

bond" rating.  Fitch, Inc., rated the warrants BB+ and BB, respectively.  (Doc. 8-10.)  "BB" investments are "speculative," and "indicate an elevated vulnerability to default risk . . . ." Fitch Ratings, Definitions of Ratings and Other Forms of Opinion at 15, available at https://www.fitchratings.com/web_content/ratings/fitch_ratings_definitions_and_scales.pdf. A November 13, 2013, Moody's report noted that "the bond trustee could . . . ask the court to compel the county to enforce its bankruptcy plan," if the County rescinded the rate increases; Moody's noted that it was "not aware of a precedent for a federal court to compel public utility rates of this nature, given the federalism issues involved in this bankruptcy." (Undocketed submission sent by the County's counsel to the court); *see also* Mary Williams Walsh, A *Municipal Bankruptcy May Create a Template*, N.Y. TIMES, Nov. 20, 2013, at B1, available at http://nyti.ms/1hMafOf.  Standard and Poor's rated the Senior New Sewer Warrants BBB and the junior warrants BBB-.  (Doc. 8-10.)  According to its rating system, "BBB" and "BBB-" represent investment-grade bonds, with "BBB-" being the lowest investment grade.  Standard & Poor's, Guide to Credit Rating Essentials at 12, available at http://img.en25.com/Web/StandardandPoors/SP_CreditRatingsGuide.pdf.

Of the proceeds from the sale of the New Sewer Warrants, $1,698,082,801.24 went toward "retiring" the existing sewer warrants (or the "Retired Sewer Warrants"), (doc. 5 at 33; doc. 6-1 at 8 (Tablack decl. ¶ 6)), which had an "aggregate principal amount of $3.08 billion as of the date on which the Plan was confirmed," (doc. 6-1 at 3).  The vast majority

of the remaining amount went toward funding an insurance policy backing the new warrants. (Doc. 5 at 33; doc. 6-1 at 8 ¶ 7.)

While the County's other debts were affected by the Plan, those effects appear much less significant in comparison to the restructuring of the debt related to the sewer system. (*See* doc. 5 at 19-23.)  As the County has stated, "The Plan provides for repayment in full of all non-sewer warrants on terms favorable to the County . . . ."  (B. Doc. 2203 at 3.) The Plan effectuates this by exchanging existing General Obligation warrants and school warrants for new ones.  (Doc. 5 at 19-21.)

On November 20 and 21, 2013, the bankruptcy court held a confirmation hearing. (*See* Transcripts of Hearings held Nov. 20, 2013 and Nov. 21, 2013.) During the hearing, the bankruptcy court went through the County's proposed Plan line by line, and it heard and responded to arguments from the Ratepayers' counsel on why the Plan should not be confirmed.  At one point, the Ratepayers' counsel summarized his clients' problems with the Plan into "three simple points":

> [1.]  The plan validates the corrupt activity that procured the execution [of the Sewer Warrants Series 2002-C, 2003-B and 2003-C-1, warrants that the Ratepayers have called the "Swap Warrants" in their brief on this Motion, (doc. 23 at 7)].

> [2.]  The plan validates the infringement on the constitutional rights of the citizens of the county, both to vote on their commissioners who set the rates, because it takes [the ability to set rates] out of the commissioners' hands, and to be free from overly burdensome debt without due process.

> [3.]  [The Plan is not feasible] because the plan is superimposed over a service area that has declining population and declining income levels, . . . [and]

18

increas[es] costs for four years without any consideration of the exact ability
of those folks to pay . . . .

(Transcript of Nov. 21, 2013 hearing at 704.)

The Confirmation Order was entered the next day, November 22, 2013.  (B. Doc.

2248.)  Two weeks before the bankruptcy court entered the Confirmation Order, the County

had asked the court to waive the automatic stay  of the Confirmation Order.  (B. Doc. 2183

at 40.)   Bankruptcy Rule 3020(e) ordinarily imposes an automatic fourteen-day stay on the

operation of a confirmation order.  The Ratepayers did not object to waiving the automatic

stay at the hearing. (Transcript of Nov. 21, 2013 hearing at 1013.)

When the bankruptcy court entered the Confirmation Order on November 22, 2013,

it exercised its discretion under the rule to waive the automatic stay.  (Doc. 1-2 at 1, 78.)  The

Ratepayers filed a Notice of Appeal on December 1, 2013, (doc. 1-3), and a Protective

Motion for Leave to Appeal, (doc. 1-4).  They did not ask the bankruptcy court for a stay of

its Confirmation Order pending this appeal.

The Plan's Effective Date was December 3, 2013.  On that day, the County issued the

New Sewer Warrants, the proceeds of which went in part toward retiring the "Retired Sewer

Warrants."  (Doc. 6-1 at 7-8.)  The Depository Trust Company, "a clearinghouse system for

institutional and individual investors who hold publicly traded securities," received "more

than $1.454 billion" of those proceeds.  (Doc. 5 at 34; doc. 10-1 at 7.)  Many of the cases that

made up the pre-bankruptcy "litigation erupt[ion]" were dismissed with prejudice.  (Doc. 5

at 13, 37.)  Some of these cases involved issues that the Ratepayers have raised; the County

19

has maintained that, to the extent the Ratepayers' claims have "any validity at all," their claims are the County's to pursue. (B. Doc. 1977 [Disclosure Statement dated July 29, 2013] at 127.)  The Ratepayers contend a conflict of interest between the County and its sewer ratepayers enables them to pursue what otherwise might be County causes of action. (*See, e.g.*, B. Doc. 2237 at 59-62;[16] doc. 23 at 19.)  The Confirmation Order bars "any and all Persons from commencing or continuing any action, directly or indirectly . . . to assert . . . any Ratepayer Claims." (Doc. 1-2 at 27, 74; *see also* doc. 7-29 at 90-91 ["[A]ny Person seeking to exercise the rights of the County (including in respect of the County's Causes of Action purportedly asserted in the Bennett Action[)] . . . are permanently and completely enjoined from commencing or continuing any action . . . ."].)  When discussing these provisions during the confirmation hearing, the bankruptcy court explained that these provisions prevented a "double recovery against the same defendants."  (Transcript of Nov. 21, 2013 at 1005.)

## B.  PARTIES' ARGUMENTS ON APPEAL

### 1.  The County

The County argues that this appeal has three parts: the Confirmation Order, the two adversary proceedings involving the Ratepayers, and the Ratepayers' proof of claim. (Doc.

---

[16]The stamps have been marked over. This document may be doc. 2237-1, and the pages referred to pages 57-60.

5 at 9.)  It argues that the first two parts should be dismissed because the first part is moot and the second part is the subject of separate appeals.  (*Id*.)

The County argues that the appeal of the Confirmation Order is moot constitutionally, equitably, and statutorily.[17]  Its constitutional argument attacks the court's subject matter jurisdiction, asserting that the appeal is not a live Article III case or controversy because events have occurred subsequent to the appeal (namely, the Plan's consummation) that make it impossible for the court to grant the appellants "meaningful relief."  (*Id*. at 39 [quoting *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001)].)  Since the Plan's terms are all "inextricably interwoven," the Ratepayers' requested relief – that some of the creditors pay back some of the money and that the County not be tied to the Approved Rate Structure – would "require the entire Plan to be unwound," and this court lacks authority to compel the County to unwind the Plan.  (*Id*. at 40-41.)

The County also argues that a "broader concept than constitutional mootness" exists called "equitable" mootness.  (*Id*. at 49.)  Equitable mootness, it claims, is a doctrine rooted in the concern for finality, and occurs when the court "cannot grant effective judicial relief."  (*Id*. [quoting *In re Club Assocs*., 956 F.2d 1065, 1069 (11th Cir. 1992)].)  The County argues

---

[17]During oral argument on the County's Motion for Partial Dismissal, the court asked counsel for the County a hypothetical question; specifically, the court asked if the bankruptcy court's retention of jurisdiction to enforce the Adjusted Rate Schedule was "clearly unconstitutional," did this court have authority to vacate that portion of the Confirmation Order.  Counsel for the County responded that the court did not have such authority.  As set forth *infra*, the court disagrees.

that "the primary question" in determining whether an appeal is equitably moot is whether the "reorganization plan has been so substantially consummated that effective relief is no longer available." (*Id*. at 52 [quoting *Miami Ctr. Ltd. P'ship v. Bank of N.Y.*, 820 F.2d 376, 379 (11th Cir. 1987)(hereinafter *Miami Center I*)].)[18]   Because the Plan has been "substantially consummated" in this case, the County argues that a "strong presumption" should arise that no "equitable and effective remedy" is available even for meritorious arguments or, at least, that the Plan "should be disturbed only for compelling reasons." (*Id*. at 55 [citations omitted].)

Besides it being impossible to unravel the Plan or return the parties to the status quo, the County argues, doing so would be inequitable because it would adversely affect third parties that received distributions from the Plan and third parties who purchased New Sewer Warrants in reliance on the Plan. (*Id*. at 58-61.) Also, the relief the Ratepayers seek would "destroy the entire Plan and propel the County back to square one in bankruptcy," apparently no matter what the relief is, because "changing even one part of such a complex confirmed plan is tantamount to destroying all of it" when it is, as the bankruptcy court found,

_____

[18]The County does not distinguish between *Miami Center I* and *Miami Center Ltd. P'ship v. Bank of New York*, 838 F.2d 1547 (11th Cir. 1988)(hereinafter *Miami Center II*). The County does not list *Miami Center I* in its Table of Authorities, and never uses the opinion's full citation. In the *Miami Center II* opinion, the court went "back to square one." *Id.* at 1548. Therefore, it seems to have overruled or vacated at least some part of *Miami Center I*. Nevertheless, because the Eleventh Circuit cited to both *Miami Center* opinions in *In re Club Assoc.*, 956 F.3d 1065 (11th Cir. 1992), it appears that *Miami Center I* has continuing precendential value.

22

"comprised of 'a complex series of interrelated compromises and settlements.'" (*Id*. at 61-63 [quoting doc. 1-2 at 10].)  The Plan should not be destroyed for "the benefit of a single, non-consenting party," especially when that party failed to seek a stay pending appeal and the Plan was substantially consummated.  (*Id*. at 64-65 [citations and internal quotation marks omitted].)

Also, the County argues that the appeal of the Confirmation Order is "statutorily moot because 11 U.S.C. § 364(e) "precludes this Court from unwinding the New Sewer Warrants . . . or any other aspect of the Plan."  (*Id*. at 68.)  The County argues that "postpetition financing under section 364 may be incurred, as here, for purposes of refinancing prepetition indebtedness," and that the protection of section 364(e) extends to all the material terms of such financing.  (*Id*. at 69 [citations omitted].)  Because the Ratepayers did not obtain a stay of the Confirmation Order and the purchasers of the New Sewer Warrants acted in good faith in extending the credit, section 364(e) renders the court unable to disturb the Plan and, therefore, any appeal is moot.  (*Id*.)

The County argues that portions of this appeal related to orders in Adversary Proceedings Nos. 12-120 and 12-16 should be dismissed because they are the subject of separate appeals, (*see* Case Nos. 2:14-CV-0214-SLB and 2:14-CV-0215-SLB), and, thus, are duplicates in this case.

### 2.  The Ratepayers

The Ratepayers argue that they are creditors of Jefferson County because they overpaid for sewer services insomuch as the rates they paid incorporated the cost of $1.63 billion in Retired Sewer Warrants that they argue were void (or voidable) because they were obtained through bribery and corruption.  (Doc. 23 at 7-8.)  In the alternative, they argue that they are interested parties or special taxpayers entitled to intervention.  (*Id*. at 12; *see also* doc. 16 at 28-29 [arguing that they have standing to appeal as "person[s] aggrieved" by the Confirmation Order and have pecuniary interest in the outcome of the appeal].)  They wish to represent a class of future (and/or past) Jefferson County sewer ratepayers.  (*See* doc. 23 at 7 ["Ratepayers . . . extended credit in the form of . . . 'overcharges' of ***current and prospective*** sewer bills"]; *id.* at 8 ["Ratepayers are creditors who have extended credit in the form of ***past and prospective*** monthly sewer fees of $3.2 billion"](emphasis added).)  Instead of the bankruptcy court enforcing the collection of sewer fees for the next forty years (*i.e.*, "act[ing] as a receiver," *id.* at 20), the Ratepayers propose that the County comply with the demands of Amendment 73 to the Alabama Constitution and secure voter approval of new sewer warrants that would replace the old ones.  (*Id*. at 8, 10-11.)

They assert that this appeal presents a live case or controversy by pointing out that the County will be under a continuing obligation to collect ever-increasing sewer rates from them to pay the New Sewer Warrant holders, and that the bankruptcy court has agreed to "enforce sewer rate increases" outside of applicable state law mechanisms.  (Doc. 21 at 9; doc. 16 at

24

26.)   They also argue that any appeal is still live since all legal issues decided by the bankruptcy court are subject to de novo review by this court.  (Doc. 16 at 24.)   The Ratepayers argue that they are the victims of "a legal strategy to use . . . equitable mootness . . . to deprive Ratepayers of a hearing on the merits of their claims."  (*Id.* at 14.)  They invoke Federal Rule of Bankruptcy Procedure 7001, reading it to require a hearing on the merits of their claims asserted in Adversary Proceedings 16 and 120.  (Doc. 23 at 15.) According the the Ratepayers, equitable mootness cannot override state constitutional rights and powers.  (*See* doc. 21 at 33; doc. 23 at 18-19.)  Plus, equity is in their favor because they "are the only group affected in their pocketbooks by the indebtedness restructured by the confirmed Plan of Adjustment," and "the only creditor group subject to ongoing [liability] from rate increases."  (Doc. 21 at 10-11.)  They argue that the County's representations in supporting confirmation of the Plan have been fraudulent, and that the County's "circumvention of the adversary rules was in bad faith and defeats any" request to invoke equity to its favor.  (Doc. 23 at 16; doc. 21 at 16.)  As for statutory mootness, they note that "[t]he new warrants provided no funding for the County[,] only money for the [prepetition] warrant holders[,] and were used to pay off [prepetition] warrants at increased cost to the County."  (Doc. 23 at 31.)  They argue that 11 U.S.C. § 364(e) does not provide protection to that sort of transaction.  (*See* doc. 21 at 18 [quoting *In re Kmart Corp.*, 359 F.3d 866, 870 (7th Cir. 2004)].)   Finally, they imply that to the extent new investors "are relying on the agreement of the bankruptcy court to enforce rate increases on the Ratepayers," such reliance

25

cannot overcome appellate review of whether a plan violates the Tenth Amendment.  (*See*

Doc. 21 at 35 [referencing "Article X"].)

## C. DISCUSSION

### 1. Constitutional Mootness

The County contends that the Ratepayers' appeal of the Confirmation Order is

constitutionally moot.[19]  According to the County:

> In an appeal from a confirmation order in a chapter 9 bankruptcy case, when the relief that an appellant seeks "would require undoing the Plan in its entirety" and undoing the Plan "would be impossible," the appeal must be dismissed as constitutionally moot because effective relief cannot be awarded. *Alexander v. Barnwell Cnty. Hosp.*, 498 B.R. 550, 559 (D.S.C. 2013).  That is the case here.  This Court cannot grant any meaningful relief with regard to the Bennett Ratepayers' appeal of the Confirmation Order because, even if this Court were to vacate the Confirmation Order, the relief that the Bennett Ratepayers seek simply cannot be granted without ultimately unwinding the entire Plan, which is legally and practically impossible.

> Although the Bennett Ratepayers' description of the relief they seek in challenging the Confirmation Order has been a moving target in the bankruptcy court (and may remain unclear in this Court), distilled to its essence, the relief they seek would require (a) certain creditors associated with the Retired Sewer Warrants to make payments to the County or the Bennett Ratepayers even though the claims on which such payments would be based have been settled and released under the Plan; or (b) the County to set sewer rates below the level that the County agreed to maintain under the Plan and in the indenture for the New Sewer Warrants.  Accomplishing either of those results would disrupt key elements of the Plan – requiring creditors to make payments could be accomplished only if the comprehensive global releases that were a foundation of the Plan were rescinded, and revising sewer rates

---

[19]"The doctrine of constitutional mootness" is "known to attorneys who do not practice bankruptcy law as simply 'mootness'." *In re Fontainebleau Las Vegas Holdings*, 434 B.R. 716, 738 (S.D. Fla. 2010).

would also disrupt the carefully-crafted deal made by the County in issuing the New Sewer Warrants.  Because all the terms of the Plan are inextricably interwoven and were part of an overarching restructuring, unwinding any of these key parts would require the entire Plan to be unwound.

(Doc. 4 at 40-41.)

The Supreme Court recently explained the origins and contours of what the County has called "constitutional" mootness:

> Article III of the Constitution restricts the power of federal courts to "Cases" and "Controversies." Accordingly, "[t]o invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990).
>
> . . .
>
> There is thus no case or controversy, and a suit becomes moot, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. ____, ____, 133 S. Ct. 721, 726 (2013)(quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982))(per curiam); some internal quotation marks omitted).  But a case "becomes moot only when it is ***impossible*** for a court to grant ***any*** effectual relief whatever to the prevailing party." *Knox v. Service Employees*, 567 U.S. ____, ____, 132 S.Ct. 2277, 2287 (2012)(internal quotation marks omitted); *see also Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)("if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed" (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895))).  "***As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot***."  *Knox, supra*, at 1019, 132 S. Ct., at 2287 (internal quotation marks and brackets omitted).

*Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013)(emphasis added).  "A case does not become moot simply because an appellate court is unable completely to restore the parties to the status quo ante." *SunAm. Corp. v. Sun Life Assurance Co. of Can.*, 77 F.3d 1325, 1333 (11th

27

Cir. 1996)(citing *Church of Scientology*, 506 U.S. at 12-14).  "However small that concrete interest may be due to potential difficulties in enforcement, it is not simply a matter of academic debate, and is enough to save [a] case from mootness." *Chafin*, 133 S. Ct. at 1026 (quoting *Knox*, 132 S. Ct. at 2287)(internal quotations omitted).

The Ratepayers seek "typical appellate relief" from the Confirmation Order – they ask this court to reverse the bankruptcy court's Confirmation Order and that the bankruptcy court "undo what it has done." *Id*. at 1024.  The fact that the Confirmation Order has taken effect – the New Sewer Warrants have issued and the Old Sewer Warrants have been retired – does not extinguish the controversy, although it may limit the scope of relief available.  If, as the Ratepayers contend, the Confirmation Order's rate-structure provision is unconstitutional, the court may strike it.[20]  Indeed, the bond rating company Fitch noted this problem with the New Sewer Warrants and rated the creditworthiness of those warrants accordingly. The Ratepayers have a legally cognizable interest in not paying rates ordered by the bankruptcy court that is acting pursuant to an unconstitutional (the court must assume for now) Confirmation Order, and, thus, they are not precluded from pursuing their appeal.  Stated

---

[20]The County seems to believe that the Approved Rate Structure is "antecedent to and ***independent of*** the Confirmation Order that validated it," as if the New Sewer Warrant holder's ability to enforce the Approved Rate Structure against ***future*** County Commissions in the very bankruptcy court that validated it is a mere convenience instead of one of the primary and extraordinary methods of securing the warrants. (*See* doc. 5 at 41 [emphasis added].)  Indeed, that security is perhaps the power the new warrant holders required but could not obtain and the assurance the present County could not provide outside of bankruptcy. The live question on appeal is whether they can obtain it in bankruptcy.

differently, the court could "fashion *some* form of meaningful relief," *Church of Scientology*, 506 U.S. at 12 (emphasis in original), by vacating the portion of the Confirmation Order that retains jurisdiction in the bankruptcy court to order rate increases according to the Approved Rate Schedule.[21]

The court finds that there is still a live controversy between the parties and, therefore, this appeal is not constitutionally moot.  The County's Motion for Partial Dismissal, (doc. 4), based on constitutional mootness will be denied.

### 2. Statutory Mootness

Citing 11 U.S.C. § 364(e), the County argues that this "appeal of the Confirmation Order should also be dismissed for the separate and independent reason that it is statutorily moot."  (Doc. 5 at 68.)

Section § 901(a) makes 11 U.S.C. § 364(c)-(f) applicable in Chapter 9 cases.  11 U.S.C. 901(a).  The relevant provisions of § 364, entitled "Obtaining Credit," provide:

---

[21]The County contends that the Ratepayers "could not compel the Jefferson County Commission to enact new rates even if the Confirmation Order were reversed." (*Id*. at n.12.) True, they must pay whatever rates the Commission imposes. But what the Ratepayers seek to avoid is paying rates set by a Commission who can be taken to the bankruptcy court if it enacts rates in violation of the Approved Rate Structure. Part of the relief they seek is the ability to elect Commissioners who, instead of "tak[ing] unpopular stances" or "actions that [are] not desired by many of their constituents," *In re Jefferson County*, 474 B.R. at 244, are accountable to them, and not to federal enforcement of the Approved Rate Structure. Vacating the Approved Rate Structure of the Confirmation Order would grant them that relief.

(c)  If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

> (1)  with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)  secured by a junior lien on property of the estate that is subject to a lien.

(d)(1)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

> (A)  the trustee is unable to obtain such credit otherwise; and
>
> (B)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

. . .

(e)  The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(c)-(e).  "The purpose of [§ 364(e)] is to encourage the extension of credit to debtors in bankruptcy by eliminating the risk that any lien securing the loan will be modified on appeal."  *Matter of Saybrook Mfg. Co.*, 963 F.2d 1490, 1493 (11th Cir. 1992).

30

The County contends that "[p]ostpetition financing under section 364 may be incurred . . . for purposes of refinancing prepetition indebtedness."  (Doc. 5 at 69 [citing *In re AMC Corp.*, 485 B.R. 279, 287-88 (Bankr. S.D.N.Y.) *aff'd*, 730 F.3d 88 (2d Cir. 2013) and *In re Texaco, Inc.*, 92 B.R. 38, 42-43 (S.D.N.Y. 1988)].)  According to the County:

> [B]ecause the County issued the New Sewer Warrants to satisfy prepetition debt and the bankruptcy court approved the financing under section 364(e),[22] that section plainly prevents any court from unwinding the County's issuance of the New Sewer Warrants under the Plan.  But the section 364(e) protection extends beyond that to all aspects of the Plan – because the issuance of those warrants depended upon the implementation of the remainder of the County's Plan, including the implementation of a new structure of sewer rates and the global settlement of legacy sewer debt issues.  Thus, ***all*** of the County's Plan falls within the ambit of section 364(e).

(*Id.* at 70 [emphasis in original; footnote added].)

According to the Eleventh Circuit, "bankruptcy courts are indeed courts of equity, and they have the power to adjust claims to avoid injustice or unfairness.  However, . . . this equitable power is not unlimited.  A bankruptcy court's equitable power must and can only be exercised within the confines of the Bankruptcy Code."  *In re Empire for Him, Inc.*, 1 F.3d 1156, 1160 (11th Cir. 1993)(quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988), and *Matter of Saybrook Mfg.,* 963 F.2d 1490, 1495 (11th Cir. 1992))(internal citations and quotations omitted).  Therefore, only transactions authorized by § 364(c) or (d)

---

[22]Subsection (e) does not provide the bankruptcy court with any authority to approve postpetition financing; subsection (e) addresses only the effect on such postpetition financing on appeal.  *See* 11 U.S.C. § 364(e).  The authority to approve postpetition financing is provided in subsections (c) and (d).  *See* 11 U.S.C. § 364(c), (d).

are protected by § 364(e).  *See Matter of Saybrook Mfg. Co.*, 963 F.2d at 1493 (By its own terms, section 364(e) is only applicable if the challenged lien or priority was authorized under section 364.)

Whether issuance of the New Sewer Warrants, together with the Approved Rate Structure, to pay off the Old Sewer Warrants was a transaction authorized by section 364(c) and/or (d) is an issue of first impression in this Circuit.  "By their express terms, sections 364(c) [and] (d) apply only to future – i.e., post-petition – extensions of credit.  They do not authorize the granting of liens to secure pre-petition loans."  *Matter of Saybrook Mfg. Co.*, 963 F.2d at 1495; *see also In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 746 (S.D. Fla. 2010)(citing Collier on Bankruptcy ¶ 364.06[2], at 364–25); *Bland v. Farmworker Creditors*, 308 B.R. 109, 116 ("[C]ross-collateralize is to get prepetition loans secured by postpetition assets" and "a lender cannot 'cross-collateralize or "refinance and re-collateralize" a prepetition secured debt by substantially all of the debtor's assets.'").

Section 364(c) and (d) authorize only particular types of actions or concessions to obtain postpetition credit or financing, and § 364(e) only protects the validity of the postpetition lender's debt and/or certain priorities and liens.  Therefore, before this court can decide that § 364(e) bars an appeal of the refinancing plan, it must decide whether the terms of the refinancing plan were authorized pursuant to § 364(c) and/or (d).  *Matter of Saybrook Mfg.*, 963 F.2d at 1493("By its own terms, section 364(e) is only applicable if the challenged lien or priority was authorized under section 364.")

32

Subsection (c) authorizes the court to allow "the obtaining of credit or the incurring of debt" by the County[23] if it is unable to obtain unsecured credit. 11 U.S.C. § 364(c). This subsection authorizes the County to obtain credit or incur debt with one of three conditions: (1) the postpetition credit or debt has priority over other administrative expenses; (2) the postpetition credit or debt is secured by a lien on unencumbered property; or (3) the postpetition credit or debt is secured by a junior lien on encumbered property. *Id*. If the County is unable to secure credit under (c), the bankruptcy court may authorize it to obtain credit or incur debt that has a senior or equal lien on encumbered property if the holder of the lien on the property is adequately protected. 11 U.S.C. § 364(d)(1). Neither subsection (c) nor subsection (d) authorizes the bankruptcy court to allow the County to obtain credit or incur debt by giving the lender or the bankruptcy court unlawful or unconstitutional rate-making authority.

Moreover, subsection (e) by its terms protects the specific forms of postpetition lending authorized by § 364. 11 U.S.C. § 364(e). Its protection is limited to the validity of the debt and the priority of the lien; these elements of postpetition debt may not be modified on appeal if a stay of the postpetition lending is not granted. *Id*.

---

[23]Under the provisions allowing a Chapter 9 bankruptcy, the County acts as the trustee and there is no bankruptcy estate.

33

To the extent the County seeks to shield all terms of the sale of the New Sewer Warrant on review by invoking § 364(e), the court will deny its Motion for Partial Dismissal based on statutory mootness.

### 3. Equitable Mootness

The County contends that the appeal of the Confirmation Order is due to be dismissed as "equitably moot" because Ratepayers did not obtain a stay of the Order pending appeal and the Plan has been "substantially consummated." It contends:

> [T]his appeal presents the quintessential case for dismissal based on equitable mootness. An exceedingly complex Plan that was overwhelmingly supported by the County's creditors has been substantially consummated. Over $1.7 billion has changed hands in payments exchanged between hundreds, if not thousands, of persons and entities. The Retired Sewer Warrants and the associated Indenture have been canceled, and there is no legal or practical ability to revive them. Likewise, the Court has no ability to cancel the New Sewer Warrants and to order the County to repay the proceeds from the sale of those warrants. Third parties have relied on the bankruptcy court's Confirmation Order in purchasing the New Sewer Warrants, and the proceeds of the sales of the New Sewer Warrants allowed the holders of the Retired Sewer Warrants to receive distributions under the Plan. The County's non-sewer debt has also been restructured, and numerous lawsuits have been dismissed with prejudice as a result of the Plan.

(Doc. 5 at 50-51.) Therefore, it argues reversing any part of the Confirmation Order would necessitate unwinding the entire Plan, which is legally and practically impossible at this point in time and which would threaten the County's emergence from bankruptcy.

"The doctrine of equitable mootness is a prudential, not a constitutional, doctrine that evolved in response to the particular necessities surrounding consummation of confirmed

Chapter 11 bankruptcy reorganization plans." *In re Bodenheimer, Jones, Szwak, & Winchell LLP*, 592 F.3d 664, 668 (5th Cir. 2009)(quoting *In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008))(internal quotations omitted).  This doctrine is called "equitable mootness" because its legitimacy does not rest on a specific provision of the Bankruptcy Code or on Article III of the Constitution, *see In re Pacific Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009), but on "equitable considerations of finality and good faith reliance on a judgment," *In re Lett*, 632 F.3d at 1226 (quoting *In re Club Associates*, 956 F.2d 1065, 1069 (11th Cir.1992)).   The problem with the doctrine's extension to this Chapter 9 case is twofold:  (1) its application is "in some tension with [the Supreme Court's] recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging," *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014)(quoting *Sprint Comm., Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013)(quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)))(internal quotations omitted);[24] and (2) it is based on Chapter 11 concepts that may be inapplicable to or inappropriate for this Chapter 9 case, *see In re Seidler*, 44 F.3d 945, 947 n.3 (11th Cir. 1995).  Although the Supreme Court's recent decisions seem to question the

---

[24]The Supreme Court did not do away with all legal theories "prudential" in nature. *See Lexmark*, 134 S.Ct. at 1387 n.3.  Instead, it reframed the matter as one of statutory interpretation. *Id.* at 1387-88 and n.4.  In June 2014, the Supreme Court yet again reminded parties seeking dismissal based on prudential grounds, this time in a case on ripeness, of its "virtually unflagging" obligation to hear cases, but the Court declined to "resolve the continuing vitality of the prudential ripeness doctrine" because its factors were "easily satisfied" in that case.  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014).

continued viability of prudential concerns as grounds for dismissal,[25] this court need not decide whether equitable mootness remains viable in Chapter 11 proceedings, because it finds equitable mootness does not apply to challenges to a Confirmation Order in Chapter 9 proceedings.

Equitable mootness is a "judicial anomaly" best used as a "scalpel," *In re Pacific Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009); it is the "exception and not the rule," *In re Semcrude, L.P.*, 728 F.3d 314, 321 (3d Cir. 2013).  Courts frequently dealing with appeals of confirmation orders of Chapter 11 corporate reorganization plans have recognized that efficiency is of paramount importance to businesses in distress.  Therefore, for private parties, courts are able to "strik[e] the proper balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy court order adversely affecting him." *See In re Club*, 956 F.2d at 1069.  Thus, when a Chapter 11 plan has been substantially consummated, no legal or factual error that threatens the entire deal is worth the cost of undoing the deal – it is too inefficient and unfair – and, therefore, the court need not even hear the arguments.  When "a successful appeal would be fatal to a plan, prudence may require the appeal be dismissed because granting relief to the appellant would lead to a

---

[25]The Fifth Circuit has recently noted that "the continued vitality of prudential "standing" is now uncertain in the wake of the Supreme Court's recent decision in *Lexmark International, Inc.* . . . ." *Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat. Ass'n*, 758 F.3d 592, 603 n.34 (5th Cir. 2014)(quoting *Lexmark Int'l*, 134 S. Ct. at 1388 ("[A] court . . . cannot limit a cause of action . . . merely because 'prudence' dictates.")).

perverse outcome." *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 168 (3d Cir. 2012), *as corrected* (Oct. 25, 2012), *cert. dismissed*, 133 S. Ct. 1001 (2013).  *But see Lexmark*, 134 S. Ct. at 1388 ("Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates.").  The judge-made doctrine of equitable mootness was developed for and should only be used when, "granting relief on appeal [is] almost certain to produce a perverse outcome—chaos in the bankruptcy court from a plan in tatters and/or significant injury to third parties.  Only then is equitable mootness a valid consideration." *In re Semcrude, L.P.*, 728 F.3d 314, 320 (3d Cir. 2013)(internal citations omitted).

The County contends that the doctrine of equitable mootness should apply in Chapter 9 appeals exactly as it applies in Chapter 11 appeals.[26]  The Eleventh Circuit has held that "'substantial consummation' is a chapter 11 concept," and that the concept was inapplicable to this chapter 13 case." *In re Seidler*, 44 F.3d at 947 n.3 (citing 11 U.S.C. 1101(2) and 103(f)).[27]  This court finds that "equitable mootness" is not applicable in a Chapter 9 appeal

---

[26]The County cites only to *Alexander v. Barnwell County Hospital*, 498 B.R. 550, 559-60 (D.S.C. 2013), in arguing that the equitable mootness doctrine's primary concept – substantial consummation – applies in Chapter 9 cases. (Doc. 5 at 52 n.16 [citing *Alexander*, 498 B.R. at 559-60].)  In *Alexander*, the district court cited § 1101(2) and Chapter 11 caselaw to find that an appeal was equitably moot; it also found the appeal was constitutionally moot. 498 B.R. at 559-60.  Apparently, the district court did not question whether Chapter 9 embraces the concept of substantial consummation.

[27]Instead of analyzing mootness using the "subsidiary questions" that "strik[e] the proper balance" in Chapter 11 appeals, the court noted that these questions are not dispositive

challenging terms of the Confirmation Order as unconstitutional although all remedies may not be available to the appellants.

In 1977, the House Report on the new Bankruptcy Act identified "two major differences [between Chapter 9, municipal reorganization, and Chapter 11,] general reorganization law:  first, the law must be sensitive to the issue of the sovereignty of the States; [and] second, a municipality is generally not a business enterprise operating for profit, and there are no stockholders."[28]  H.R. Rep. No. 95-595, at 263 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6221.  "The bankruptcy of a public entity," such as the County, "is different from that of a private person or concern.  Unlike any other chapter of the Bankruptcy Code, Chapter 9 places federal law in juxtaposition to the rights of states to create and govern their own subdivisions."  *In re City of Colorado Springs Spring Creek Gen. Imp. Dist.*, 177 B.R. 684, 693 (Bankr. D. Colo. 1995).   This difference between Chapter 9 and other bankruptcies requires courts to recognize that Congress enacted Chapter 9 in a "constitutional balance" that contemplates "the delicacies of the state-federal relationship."   *In re City of Stockton, Cal.*, 478 B.R. 8, 23 (Bankr. E.D. Cal. 2012).

---

ones, then asked only "whether effective judicial relief is available to [the appealing creditors] should they prevail on the merits [of the creditors' appeal from 'the adversary proceeding determining validity of [a competing] lien.'"  *In re Seidler*, 44 F.3d at 947, 949. In other words, it needed only to determine that the appeal represented an Article III case, and found that the appeal "continue[d] to be justiciable."  *Id*. at 949.

[28]An earlier draft of the Bankruptcy Act from the Senate would have given bankruptcy judges "full and complete responsibility for cases under title 11," but given responsibility for Chapter 9 and railroad reorganizations to the district courts.  *See* S. Rep. No. 95-989, at 154 (1978), *reprinted in* 1978 U.S.S.C.A.N. 5787, 5940.

Prudential concerns, created in response to complex, but private, corporate reorganizations, cannot insulate a bankruptcy court's decision on constitutional issues involving public governmental entities.

The prudential concerns of a Chapter 9 plan are different from the prudential concerns of a Chapter 11 plan.   "[T]wo policies underlying Chapter 11" are "preserving going concerns and maximizing property available to satisfy creditors." *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999).  The policy underlying Chapter 9 "is not future profit, but rather continued provision of public services."  *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34-35 (Bankr. D. Colo. 1999).  These major differences in the purposes of Chapter 9 and Chapter 11 reorganizations alter analysis of whether equitable considerations should factor into this court's decision to hear the Ratepayers' appeal.  *Cf. In re City of Desert Hot Springs*, 339 F.3d 782, 789 (9th Cir. 2003)("[S]ignificant differences between a chapter 11 bankruptcy and a chapter 9 bankruptcy . . . change the analysis of the question of finality . . . .").  The County asserts that the "equitable-mootness doctrine exists to promote finality," (doc. 5 at 64), but it does not acknowledge that the equitable mootness doctrine requires a weighing of "finality and good faith reliance" against "competing interests that underlie the right of a party to seek review of a bankruptcy court order adversely affecting him," *see In re Club*, 956 F.2d at 1069.  In the case of a Chapter 9 reorganization plan – finality and reliance may be required to yield to the Constitution and the interest of the public in the provision of governmental services.

39

In this case, one of the costs of finality is to allow a non-Article III court to decide important constitutional questions that place substantial future financial obligations on the citizens of Jefferson County without representation.  The court notes that the County once argued that a predecessor to this case presented "knotty state-law questions," including "whether a county can validly alienate its ratemaking power in an ordinary contract, without some form of legislative authorization if not a vote of the citizens." *See Bank of New York Mellon v. Jefferson County*, Case No. 08-CV-1703-RDP, doc. 77 at 10-12 (N.D. Ala. Mar. 23, 2009)(Jefferson County's Motion to Stay).  The County argued that important issues of federalism, which were enshrined in law in various abstention doctrines, should cause a federal court to decline hearing the very questions that the bankruptcy court seemingly decided, *see id.*, and the district court agreed, *see, e.g.*, *id.*, doc. 100 at 53 (N.D. Ala. June 12, 2009); *see also In re Cottonwood Water & Sanitation Dist., Douglas Cnty., Colo.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992)("[M]unicipal bankruptcies involve significant problems which are not encountered in the private sector.  Important constitutional issues arise when a municipality enters the bankruptcy arena."); 11 U.S.C. § 943(b)(6) (requiring "electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan").  However, applying the doctrine of equitable mootness as the County espouses, would prevent **both** state and federal Article III courts from deciding those "knotty state law" and constitutional issues and would prevent any review of a federal bankruptcy court's assumption of jurisdiction to enforce its unreviewed actions.  *See In re Pacific Lumber Co.*,

40

584 F.3d 229, 243 (5th Cir. 2009)(declining to dismiss appeal as equitably moot and noting that "[f]ederal courts should proceed with caution before declining appellate review of the adjudication of [constitutional] rights under a judge-created abstention doctrine.").

Although this court agrees that some part or parts of the Confirmation Order may be impossible to reverse, the County's ceding of its future authority to set sewer rates to the bankruptcy court as a term of the New Sewer Warrants is not one of those parts.  If, as the Ratepayers contend, this part of the Confirmation Order is unconstitutional, this court may so declare and prohibit enforcement of that term.  A similar constitutional issue would not arise in private contracts under a Chapter 11 plan.

Because Chapter 11 concerns private business entities, the good faith reliance of private investors on the bargains that bring about voluntary reorganization plans are treated with deference, and courts may refuse to undo these agreements when equity so demands. *See Miami Center II*, 838 F.2d at 1156.  In proposing the adoption of a Chapter 11 perspective in this Chapter 9 case, the County points out the inequity to the purchasers of the New Sewer Warrants.  However, because the County is a political subdivision of the State of Alabama, significant public interests are at stake.[29]  The Ratepayers are not investors or

---

[29]In a different ratemaking context, Justice Marshall once noted that "given the substantial element of public interest at stake in a case such as this, it is appropriate to recall Mr. Justice Stone's oft-quoted admonition:  'Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 732 (1973)(quoting *Virginian R. Co. v. Systems Federation No. 40*, 300 U.S. 515, 552 (1937)) (Marshall, J.,

shareholders whose stake in this case is limited to the amount of their investment; they are citizens of the County dependant upon the County for provision of basic sewer service. As such, they are the revenue source for payment of the New Sewer Warrants; however, their interest is not limited to a finite financial amount.[30]  Rather, their interest in continuing to receive essential sewer service is not protected by the political system of County governance nor do they have a voice in future rate-making.  As the Alabama Attorney General recognized in seeking to intervene on behalf of the then-unrepresented ratepayers in a state court case preceding the bankruptcy, the outcome of this litigation "will have a substantial impact on the rights of ratepayers and their ability to obtain service at just and reasonable rates from a public utility which is a monopoly provider."  *Bank of New York Mellon v. Jefferson County, Alabama*, No. CV-2009-2318, Motion to Intervene at ¶ 3; *see also* Press Release, Luther Strange, Alabama Attorney General, AG Seeks to Intervene in Jefferson County Sewer Case (June 15, 2011), *available at* http://www.ago.state.al.us/News-66.

In light of the public and political interests at stake in any Chapter 9 proceedings, the court will deny the County's appeals to equity to allow allegedly unconstitutional provisions of the Confirmation Order to stand without review.

---

concurring in part and dissenting in part).

[30]The bankruptcy court was "acutely aware" that "the demographics of Birmingham are such that the unfortunate reality is [that] a large part of [the sewer's] collection system is . . . in the lower[-]income areas." (Transcript of Hearing on Nov. 21, 2013, at 723.)

Even if the court considered equitable mootness as appropriate in Chapter 9

proceedings, the court would, nevertheless, deny the County's motion to dismiss.

> Equitable mootness, a concept primarily applied in the bankruptcy context, "is
> 'a pragmatic principle grounded in the notion that, with the passage of time
> after a judgment in equity and implementation of that judgment, effective
> relief on appeal becomes impractical, imprudent, and therefore inequitable.'"
> *AVCO Corp. v. Citation Corp.* (*In re Citation Corp.*), 371 B.R. 518, 522 (N.D.
> Ala. 2007)(quoting *MAC Panel Co. v. Va. Panel Corp.*, 283 F.3d 622, 625 (4th
> Cir. 2002)).  To decide whether an appeal is equitably moot, a court "must
> determine whether the 'reorganization plan has been so substantially
> consummated that effective relief is no longer available.'" *First Union Realty
> Estate Equity & Mortgage Investments* (*In re Club Associates*), 956 F.2d 1065,
> 1069 (11th Cir. 1992)(quoting *Miami Center Ltd. Partnership v. Bank of New
> York,* 820 F.2d 376, 379 (11th Cir.1987)).
>
> Substantial consummation by itself is not dispositive, however, and a
> court must consider all relevant circumstances to decide whether it can grant
> effective relief, including whether a stay pending appeal has been obtained,
> what type of relief the appellant seeks, and what effect granting that relief
> would have on third parties not before the court. *In re Club Associates*, 956
> F.2d at 1069.  The court is charged with "striking the proper balance between
> the equitable considerations of finality and good faith reliance on a judgment
> and the competing interests that underlie the right of a party to seek review of
> a bankruptcy court order adversely affecting him." *Id.*

*Davis v. Shepard*, 2014 WL 2768808, *6 (N.D. Ala. 2014).  As set forth above, the court

finds that it can grant some relief to the Ratepayers, if successful on appeal, in the form of

striking any allegedly unconstitutional terms in the Confirmation Order regarding the

bankruptcy court's authority to set the rates for sewer service.

In a Chapter 11 reorganization, the appellants' failure to obtain a stay of the

confirmation order pending appeal is a significant, but not dispositive, factor in favor of

dismissing an appeal as equitably moot.[31]  (*See* doc. 5 at 65-67.)  In this case, the court finds

that seeking a stay was futile and cost-prohibitive.

The County successfully moved the bankruptcy court to waive the automatic fourteen-

day stay and now complains that the Ratepayers, who sought an appeal nine days after

confirmation, should have opposed their motion.  In this case the County has admitted that

it "intend[ed] to close [the deal on the sewer warrants], if the court confirms . . . and to moot

out any appeal."  (Transcript of Nov. 20, 2013 hearing at 7-8.)  The bankruptcy court also

expressed its intention that the Plan be consummated quickly; at the confirmation hearing,

it stated:

> This deal has to be put together quickly.  It has to be closed quickly for various
> reasons, some of which are legal, some of which are tactical.  But the one that
> I am focused on is that the original deal came undone because of market
> conditions, and I don't want to leave this deal out there very long so that we
> have interest rate shifts or something else that we may not contemplate that
> will undo the deal.  And that is why I'm doing what is somewhat of an
> unusual, maybe an extraordinary [way to expedite the deal].

(Transcript of Nov. 21, 2013 hearing at 840-41.)  This court is not inclined to dismiss

Ratepayers' appeal as "equitably moot" based on the rush to consummation.  *See In re Paige*,

584 F.3d 1327, 1343 (10th Cir. 2009) ("[W]here, as here, the parties attempting to convince

---

[31]*In re Winn-Dixie Store, Inc.*, 286 Fed. App'x 619, 623 (11th Cir.
2008)("Importantly, although not dispositive to the availability of judicial relief, when a party
has failed to seek a stay of the confirmation order pending appeal to the district court, for
practical reasons it is often difficult for courts to afford relief to the appealing party because
the court is unable to rescind transactions taken in consummation of the reorganization plan
and confirmation order enforcing said plan.")(internal citations omitted).

the court not to reach the merits have accelerated the consummation of the plan despite their

knowledge of a pending appeal – in this case, by waiving the requirement that the

consummation await the resolution of all pending appeals – we are less inclined to grant their

wish that the court abstain from reaching the merits on appeal."). Under the circumstances,

no stay would have been granted even if Ratepayers had moved the court and somehow were

capable of obtaining an appeal bond.[32]

The Plan, as confirmed, conditioned its Effective Date on the Plan not being subject

to any stay. (B. Doc. 2182 at 78.) In fact, any stay would have allowed the purchasers of the

New Sewer Warrants to back out of the deal entirely, mooting the confirmation of the Plan.

(Doc. 24 at 16.) In the face of the bankruptcy court's stated concerns and the Plan's express

provisions, a motion for a stay pending appeal would have been futile. Equity does not

require futile gestures. *Munchak Corp. v. Cunningham*, 457 F.2d 721, 725 (4th Cir. 1972)

---

[32]Stays cost money, and in a case, which  involved the sale of $1,785,000,000 worth of investment securities, the price of an appeal bond would be cost prohibitive to Ratepayers. *Cf. In re Chemtura Corp.*, 09-11233 REG, 2010 WL 4638898, at *1 n.4 (Bankr. S.D.N.Y. Nov. 8, 2010) ("And on this record . . . any material stay of the effectiveness of the Confirmation Order would be unthinkable.  If the request [was] even considered, the necessary bond, in this case with a [total enterprise value] of $2.05 billion, would have to run in the hundreds of millions of dollars."); *Miami Center Ltd. Partnership v. Bank of New York*, 838 F.2d 1547, 1549 (11th Cir. 1988)(noting that bankruptcy court, in case involving at least $255,600,000 changing hands, conditioned granting a stay pending an estimated year-long appeal upon appellant posting a $140,000,000 bond).  When withdrawing their emergency motion for a stay on December 3, 2013, (*see* B. Doc. 2268), counsel for another group of ratepayers noted that the ratepayers obviously could not file a supersedeas bond adequate for a claim of over a billion dollars. (*See* Transcript of Dec. 3, 2013 hearing at 11.) The court does not fault the Ratepayers for failing to collect the millions of dollars that an appeal bond would require.

("Equity does not require the doing of a futile act as a condition to the granting of equitable relief.")(citation omitted); *Stewart v. United States*, 327 F.2d 201, 203 (10th Cir. Wyo. 1964)("But, equity will not require a useless thing, or insist upon an idle formality.").

In short, the fact that "the Bennett Ratepayers did ***nothing***," to stay the consummation of the Plan is not "particularly inexcusable" to this court.  (*See* doc. 5 at 66 [emphasis in original].)  The equitable considerations for mooting an appeal in a Chapter 11 case are not the same in a Chapter 9 case.  Here, the equities lie with the Ratepayers, and the questions they raise about the legality and constitutionality of the Confirmation Order affect public and political interests – not merely private interests – and, thus, counsel for Article III review of the Confirmation Order.

The County's Motion for Partial Dismissal will be denied as to its contention that the Ratepayers' appeal of the Confirmation Order is equitably moot.

### 4. Motion to Dismiss Appeal of Orders in the Adversary Proceedings and Motion to Consolidate

The County argues that the Ratepayers cannot "include in the present appeal [Case No. 2:14-CV-213-SLB] challenges to the adversary-proceeding orders because this matter, which is an appeal in the County's main bankruptcy case, is not an appeal in the adversary proceedings." (Doc. 5 at 73.)  The court notes that the Ratepayers' Statement of the Issues on Appeal filed in the "main" bankruptcy case, (doc. 1-7), contains issues related to orders in two adversary proceedings – AP No. 12-0016-TBB [hereinafter AP 16] and AP No. 12-

0120-TBB [hereinafter AP 120].  The Notice of Appeal states the Ratepayers are appealing the following orders:

(1)  Order Severing Complaint in Intervention and Motion for Class Certification; signed on 8/15/2012 ***Adversary Proceeding 16***, Docket No. 139 (RE: related AP 16 Docket No. 126 – Complaint in Intervention Filed by Bennett Ratepayers filed July 13, 2012), together with the following Rulings from AP 16 [–] to the extent construed to be preclusive of Ratepayers claims or causes of action in either Adversary Proceeding 120, the Bankruptcy Case or on appeal:

a.  Memorandum Opinion On Net Revenues And Applicability of 11 U.S.C. § 928(b) [AP 16 Docket No. 119], dated June 29, 2012;

b.  Order On Net Revenues And Applicability of 11 U.S.C. § 928(b) [AP 16 Docket No. 121], dated July 2, 2012;

c.  Order On Net Revenues And Applicability of 11 U.S.C. § 928(b) [Bankr. Docket No. 1101], dated July 2, 2012; [duplicate of subparagraph b, *supra*]

d.  Agreed Order (I) Resolving Jefferson County's Motion for Reconsideration; Reserving Certain Issues and Directing Entry of Partial Final Judgment in AP 16; and (III) Establishing a Schedule in AP 67 [AP 16 Docket No. 152], dated October 9, 2012;

e.  Agreed Order (I) Resolving Jefferson County's Motion for Reconsideration; Reserving Certain Issues and Directing Entry of Partial Final Judgment in AP 16; and (III) Establishing a Schedule in AP 67 [Bankr. Docket No. 1350], dated October 9, 2012; [duplicate of subparagraph d, *supra*]

f.  Amended Memorandum Opinion On Net Revenues And Applicability of 11 U.S.C.§ 928(b) [AP 16 Docket No. 151], dated October 9, 2012; and

g.  Partial Final Judgment [AP 16 Docket No. 153], dated October 9, 2012.

(2)  Order Denying Motion to Reconsider this Court's Order Staying this Adversary Proceeding (Related to Doc #98) Signed on 7/1/2013 (Entered: 07/01/2013) *AP 120* Docket No. 108.

(3)  Order that the Request for a Stay is granted and this Adversary Proceeding is stayed in its entirety pending further order of this court. Signed on 6/7/2013 (RE: related document(s) 92  Reply filed by Defendant Jefferson [C]ounty, Alabama). (Entered: 06/07/2013) *AP 120* Docket No. 95.

(4)  Order Sustaining Objection of Jefferson County, Alabama to Proofs of Claim filed by Roderick V. Royal and Others (Claims 1292 and 1305) Signed on 11/12/2013 [and related docs. 1945, 2013, 2016-2017, 2141, 2151, 2196].

(5)  Order Denying Motion for Clarification or Reconsideration Based On Two Cases Cited as Authority by the Court on Objection of Jefferson County, Alabama to Proofs Of Claim Filed by Roderick V. Royal and Others (Related Doc 2160 and Order Denying Motion to Alter or Amend or for Relief from a Final Judgment (Related Doc 2174), Signed on 11/26/2013. Modified on 11/26/2013 to correct text.  (Entered: 11/26/2013).  Bankruptcy Case Docket No. 2251.

(6)  Findings of Fact, Conclusions of Law and Order Confirming the Chapter 9 Plan of Adjustment for Jefferson County, Alabama Signed on 11/22/2013 (RE: related document(s)1911 Amended Chapter 9 Plan filed by Debtor Jefferson County, Alabama, 2182 Amended Chapter 9 Plan filed by Debtor Jefferson County, Alabama).  The Plan, as previously modified and as modified by any modifications made at the Confirmation Hearing, is APPROVED and CONFIRMED.  The Plan Settlements Motion 2183 is GRANTED in its entirety.  Any resolutions of objections to confirmation of the Plan or to the Plan Settlements Motion explained on the record at the Confirmation Hearing are hereby incorporated by reference.  All unresolved objections, statements, joinders, comments, and reservations of rights in opposition to or inconsistent with the Plan or the Plan Settlements Motion have been fully considered by the Court and are hereby OVERRULED with prejudice on the merits and in their entirety.  The Administrative Claims Bar Date shall be January 31, 2014. (Entered: 11/22/2013). Bankruptcy Case Docket No. 2248.

(Doc. 1-3 at 1-4 [emphasis added].)

"Adversary proceedings are separate lawsuits from which separate appeals may lie. Accordingly, separate notices of appeal must be filed with regard to each separate adversary proceeding." *In re Robinson*, 196 B.R. 459, 460 n.2 (Bkrtcy. E.D. Ark.,1996), *cited in* doc. 5 at 73.   Ratepayers filed three Notices of Appeal in the bankruptcy court and filed three appeals in this court – Case Nos. 2:14-CV-0213-SLB; 2:14-CV-0214-SLB; and 2:14-CV-0215-SLB.   The Notice of Appeal in this case, which purports to be the appeal of the Confirmation Order and denial of the Ratepayers' proof of claim, lists documents from the adversary proceedings, each of which is the subject of its own appeal.

In response to the County's Motion to Dismiss, Ratepayers filed a Motion to Consolidate.  (Doc. 14.)  Consolidating Ratepayers' appeals would not allow them to raise every issue in each of their cases, which appears to be their desire.   Indeed given the unfocused nature of their issues and their briefs, the court finds limiting Ratepayers to specific issues in specific appeals may aid the court in their resolution far more than consolidating the cases.   Therefore, the Ratepayers' Motion to Consolidate, (doc. 14), will be denied.

The court will grant the County's Motion to dismiss from this case Ratepayers' appeal of the orders entered in the adversary proceedings.   Specifically, this court will not consider on appeal in this action:

(1)     Order Severing Complaint in Intervention and Motion for Class Certification, AP 16, doc. 139, and/or the related documents a-g;

49

(2)      Order Denying Motion to Reconsider, AP 120, doc. 108, and/or related documents AP 120, doc. 98; and

(3)      Order granting request for stay, AP 120, doc. 95, and/or related document AP 120, docs. 92.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that the Ratepayers' appeal is not moot; therefore the County's Motion to Dismiss the appeal as moot will be denied.  The Motion to Dismiss the Ratepayers appeal of orders entered in the Adversary Proceedings will be granted.  The Ratepayers' Motion to Strike and Motion to Consolidate will be denied.  An Order denying in part and granting in part the County's Motion for Partial Dismissal, (doc. 4); denying the Ratepayers' Motion to Consolidate, (doc. 14); and denying their Motion to Strike, (doc. 15), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 30th day of September, 2014.

_Sharon Lovelace Blackburn_
SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE